Corporation, et al., oral argument on Tuesday, 15 minutes per side, with Mr. Wilkins as the judge. Judge Batchelder, if I might reserve three minutes for rebuttal. May it please the court, Scott Wilson, representing the plaintiff appellant, Shelley Brown. This case concerns a claim for disability benefits under an ERISA-governed short and long-term disability plan. Ms. Brown ceased work after suffering increasing symptoms of fatigue, joint and muscle pain, ultimately diagnosed by her physicians as chronic Lyme disease. Cases like this one frequently turn on pitting the supporting opinion of treating physicians versus the opinions of non-examining physicians hired by the plan. And certainly in this case, there are multiple doctors who support Ms. Brown, while the plan did rely on non-examining medical consultants. But even before we reach the question of exertional restrictions and limitations, Ms. Brown is unable to perform her job, and under this plan, disability is defined in terms of inability to perform the specific job, not the general occupation. She's unable to perform her job simply on the basis of her medical regime. Her physicians, in their judgment, placed her on a long-term regimen of IV antibiotics. After the claim was originally denied, Ms. Brown was informed that she had to return to work, that if she did not return to work, that her employment would be terminated. She did, in fact, return to work, and she reported that she took her IV medications and the equipment for their administration to work with her. How long does it take to do this IV? My understanding... Is that in the record? That is not in the record, Your Honor. My understanding was that it took some period of time. I am honestly not certain why it was that her manager would not allow her to bring them. I don't know if the manager felt that it would be a disruption to her work. I don't know if the manager thought that it was a disruption to other employees, that it was just generally going to be difficult in the workplace. I'm uncertain why. All I know is that she took them to work and was told that she couldn't have them there. She's supposed to do it, what, three times a day? It's three times a day, Your Honor. You know, if it takes only 30 minutes, she could do it early in the morning and at noontime and in the afternoon or something, or twice in the evening, and we don't really know how long it takes. My understanding, Your Honor, is that it needed to be equally spaced throughout the day, which means at least one administration was going to be. Is that in the record? That is not in the record, Your Honor. This is speculation that goes beyond the face of the record. My client reported to the defendant, to the plan, what had happened, that she took the medications with her to work and that that was deemed unacceptable by the manager. That was reported to the plan. The plan's response was simply that there is nothing in the documentation that the schedule could not be accommodated around a work schedule. I would state that it is plaintiff's position that that statement is simply untrue. There is documentation that it couldn't be accommodated. My client's explanation that the manager wouldn't allow it. Now, it may be that this is a situation where, rather than a ward of benefits, remand is in order so that the plan can actually go back and conduct some sort of analysis. But this is a situation where my client reported to the plan, to the decision maker, that the medications were unacceptable, that it wasn't allowed in the job. I'm having trouble relating the issue of whether she should have been offered the chance to, or the ability to have her IVs at work and the question of whether it was arbitrary and capricious to say that there was no objective evidence of her condition. This is a Lyme disease case, right? This is a Lyme disease case. There's got to be some objective basis for the Lyme disease in order for us to even get to the issue of the IVs. Is that correct? I would agree with that statement. I'm curious about whether there's objective manifestation of the Lyme disease apart from the objective manifestation of the fact that she wasn't allowed to have an IV. Your Honor, in answer to that question, as you are undoubtedly aware, Lyme disease is one of the more controversial diagnoses that are out there today. And I would concede that my client does not meet the diagnostic criteria set forth by the CDC. Can't the administrator of the plan rely upon the CDC criteria? If I might elaborate further, I think that you've anticipated where I was going. I'll be getting right. Is there an answer to that? First of all, this particular plan doesn't state what diagnostic criteria are allowed. We certainly see plans that state that, for example, radiculopathy can only be established by EMG. That's simply not in this plan. That would require something in the nature of objective language, which can be interpreted under the arbitrary and capricious standards of the administrator. It requires something more than very genuine-sounding questions of pain. Your Honor, I believe that there is more here than genuine-sounding complaints of pain and fatigue. Ms. Brown's doctors did not simply take her word for it. Ms. Brown's doctors repeatedly, over the course of several months, administered the IGENIX Lyme disease test, which was, A, I concede, not diagnostic of Lyme disease by the CDC criteria, but it was ultimately positive for Lyme disease via the IGENIX criteria. That is, on objective findings of the laboratory who sold and evaluated the test, she did meet their criteria. Now, I would concede that Lyme disease is a controversial diagnosis these days. At the same time, Ms. Brown's doctors didn't simply take her word for it. Instead, they went with what admittedly may be a minority medical view, but they're not out of left field. They're going with exactly what criteria the manufacturer of the test uses. And I think that that's particularly significant when we look beyond the question of exertional restrictions, ability to sit and stand and walk and lift, and move on to the fact that it seemed that the medication regime itself was incompatible with the workplace. As a disability lawyer, I see an awful lot of bad back cases, and I see an awful lot of range in which or what sorts of back problems different orthopedists will agree to do a back surgery on. Some doctors will do the back surgery pretty quickly. Other doctors seem to hold a more rigorous criteria before they'll go ahead and do that back surgery. If all that is true, then how do we find that the plan administrator in disagreeing with the Igenex people was arbitrary and capricious? They are arbitrary and capricious in that on a good faith basis and in accordance with at least reputable minority opinion, her doctors said, you need this treatment. The plan actually said that she has to follow this treatment. If she didn't follow the treatment that her doctors recommended, she would be not disabled under the terms of the policy. She actually has to follow the treatment. Her doctors weren't coming out of left field. This wasn't phrenology. This wasn't voodoo. They were saying on a good faith basis based upon my medical opinion, you need this medication. You need this treatment. My client then went along with that treatment only to find that the employer would not allow that treatment to go on in the workplace facility. Essentially, we would be putting plaintiffs in a situation where if their doctor suggests something, if their doctor prescribes something, they would have to second-guess their doctors and say, no, I shouldn't. What about a situation where a doctor makes a recommendation and a prescription based on convincing pain complaints of the patient that are not objectively ascertainable? I'm not saying that's necessarily the case here, but it seems to me your argument would in that case require disability payments because the patient had to do what the doctor said, but the patient's doing it, in my example, based on assertions that lack an objective basis. That's what the contract or the plan was explicitly trying to avoid payment for. I think that my answer to that is that my client is objectively on those IV antibiotics. The doctor has, in accordance with medical practice, found that a treatment is necessary. But if that finding is based on not a relation of the patient rather than x-rays or something objective like an x-ray, then it's unfortunate it would seem under the plan that there's no recovery, but the plan seems to exclude that. Maybe it's over-exclusive, I don't know, but it seems to exclude that, doesn't it? I think that that would be stretching the plain meaning of the plan to its logical extremes such that somebody who, in good faith and with the good faith of their doctor, is going with legitimate medicine and... It seems to be what it says. The plan says you've got to have something objective there. I'm confident, but I don't know, that doctors prescribe things based on pain complaints or symptoms that are only related but have no physical or objective basis. My time is up, but I would suggest, for example, that an example to get us away from the Lyme disease might be depression. And an antidepressant with severe side effects, the person is objectively on the antidepressant. We might objectively see the side effects, even though the original complaint that led to the prescription may be somewhat subjective. And besides, I believe the doctor had an objective basis for the prescription in this case. Thank you. May it please the court. My name is David Knox. I'm here on behalf of the appellees in this matter. And I believe the court has honed in on the fact that there's really only one question before the court today. Did the appellees offer a reasoned explanation based on the evidence in the administrative record to reach the decision to deny the prescription? They did. Even if other conclusions can be reached from the administrative record, they are ultimately irrelevant. Because there's evidence in the record to support the appellees' decision to deny Ms. Brown's claim, and the appellees offered a reasoned explanation for their decision, it was not arbitrary and capricious as a matter of law, as this court has established in previous opinions. So the district court's decision was correct and should be upheld. There are several items that are not in dispute in this case. The first is the standard of review, and I think the court has already recognized here that this is being analyzed under the arbitrary and capricious standard of review, which this court recognized in McLean v. Eaton as an extremely deferential standard of review. It's also not in dispute the contents of the administrative record. We're not dealing with a situation where there's extraneous information that's trying to be brought in. We have the record, it is complete, and the decision and the evaluation is based on that. How does this situation that was brought up where the claimant wants to take this IV to work and they deny that and that's been raised here, how does that fit into this whole scheme? Well, there's two things to look at with that, Your Honor. First is the focus of the decision being on the definition within the plan of what constitutes a disability under the terms of the plan. The definition, as Judge Rogers has pointed out, requires significant objective findings, which are defined as signs noted on a medical examination or some type of medical test that are considered significant anatomical, physiological, or psychological abnormalities and which can be observed apart from the claimant's symptoms. So we're really honing in on what is contained in the medical records that shows some form of abnormality that is considered significant. With respect to this regime of medication, counsel admits in the brief and stated here in oral argument they don't really know why the manager told Ms. Brown that she couldn't come to work that day. But Ms. Brown's statement, which is the only evidence in the entire administrative record related to this, Ms. Brown's statement says that the manager told her you have to follow the company's reasonable accommodation process. You're showing up back to work, you have a PICC line, you have a regime of medication that you're saying you have to take. We have a process for dealing with situations where you've got medical restrictions or medical limitations or a medical regime that you have to follow, and all we're saying is follow the reasonable accommodation process. Contact your FedEx, what we call the human capital management manager. Contact them. Talk to them about what type of accommodation may or may not be needed. As Your Honor was mentioning earlier, there may be times during the day that need to be carved out so that you can have some time set aside to administer your medication. Just follow the process. He didn't turn her down per se. He just said you've got to follow the rules of the business here. Absolutely. She didn't do it or what? There's nothing in the record to indicate that she did. We don't really know. Exactly, Your Honor. Secondly, and I think what's equally important on this, counsel is trying to impose upon a manager at Federal Express the ability to speak as the administrator of the plan. That's simply not the case. This manager is not a spokesperson for the plan. This manager is not a doctor. This manager is not a treating or peer review physician rendering an opinion as to whether or not Ms. Brown suffers from a disability within the definition of the terms of the plan. They're just simply administering. They're following their responsibilities as a manager to make sure that she follows the plan, or, excuse me, follows the company's processes. Did any of the doctors that examined the claimant there say that there were objective findings showing she had Lyme disease? I don't believe that there are, Your Honor. The closest you would come would be Drs. Christ and Callaghan, which were the two treating physicians for Ms. Brown that made this diagnosis. But in going back through the record and looking at what they said about it, it's very interesting, and I think it's illuminating, to look at the first two rounds of Lyme disease testing. In both of those tests, one of the doctors, I'm presuming it's Dr. Callaghan, I'm not certain on that, but one of the doctors hand wrote on the test results here, this is a negative test result, and it was under both the CDC and the IGENIX standards. This is a negative result. However, because of your symptoms and because of certain indeterminate bands, it's likely that you have chronic Lyme disease, or it's probable that you have Lyme disease. So there's not a definitive diagnosis in there. There's a doctor's educated guess, perhaps, one treating physician's opinion that says, based on this negative test result, I'm going to say you've got Lyme disease anyway. Now, it's also important to note that all three rounds of Lyme disease testing came back negative under the CDC standards across the board. Can you just say in a word what you'd be talking about, finding certain chemicals in the blood or infrared tests of their skin, or what are these tests? Well, the test setup, it's too complicated. Don't bother. It kind of gets in detail. There's a little bit laid out in the briefing about how it goes in reference to the websites with the CDC, kind of explain the process in greater detail. But they're basically looking for the presence of antibodies in, I believe, in the blood or in the blood serum. Thank you. If I may, I don't want to belabor the point much, but with the CDC's testing standards, there's actually two tiers that have to be followed. The first tier looks at a certain range of antibodies. If that test is positive, then you move on to these IgG and IgM western blots. But you never move on to those until you have positive tests at the Tier 1 testing. And other than the first round of testing, in which case the Tier 1 came back negative, we don't have, they never presented the other Tier 1 testings. So we don't know how reliable these tests are. And, in fact, the CDC informs us that the one western blot test, which came back positive under the IgG standard, it is so far removed from any potential exposure to Lyme disease that it's almost inherently unreliable. All of that can be taken out, however, Your Honor, because what we're left with is a series of tests based on the CDC standard, all of which are negative. That provides a reasonable basis for the plan to say, there's no objective finding that you have Lyme disease. And that's entirely consistent with what the plan did here. So with regard to the treatment, it seems, as I understand this case, that the claim with regard to the treatment is, well, the treatment itself is objective evidence of some kind of a disability. But we don't have any other disability being claimed other than Lyme disease. So it seems as if the claim is sort of being made, or maybe explicitly being made, that the treatment, having been prescribed, is objective evidence that the underlying condition is there, and it is therefore arbitrary and capricious for the plan not to recognize that as a basis for finding disability. Am I just not understanding what's going on here, or is that what's being argued? Actually, Your Honor, I don't know that Appellant was arguing it quite that well, but I think that is in a gist what they are trying to say, is the fact that there is a treatment regime must mean that there's some type of condition that's there. The problem that they have there is, even if there is some type of condition for which treatment is being prescribed, it doesn't necessarily mean that there's significant objective findings that the condition actually exists. The fact that it's being treated doesn't mean you have the condition that you're presumably being treated for, and I think that's what Judge Rogers was alluding to earlier. Sometimes you have a treatment regime that is prescribed because there are symptoms here. We're not sure if the condition is actually there, but we're going to go ahead and treat and see what happens. Maybe it will improve. It's kind of an expanded version of the old adage that a doctor would tell you, I come in with symptoms, take two aspirin, call me in the morning. This is an expanded version of basically that statement here. What is interesting with that particular argument is we're trying to say treatment constitutes a disability under the plan, or treatment satisfies the definition in the plan of disability, even though the actual test results looking for that specific condition say it's not there. And I don't think you can take a treatment regime and use that as medical evidence of the existence of some abnormality when the records that specifically test for that abnormality show that it's not there. In addition to that... Don't show that it is there. I'm sorry. Don't show that it is there is the more precise way to say it, absolutely. In addition to that, we are talking about a situation where these two doctors say we're going to treat her for this chronic Lyme disease. But what we have in the record is seven other treating physicians, seven other physicians or health care providers. Most of them physicians, one a family nurse practitioner. But health care providers that met with Ms. Brown, treated Ms. Brown, observed Ms. Brown, made records of their observations. All of them recognized that she states she has these symptoms and she informs them that she's got fevers and aches and pains and rashes and tremors and all kinds of things that she complains of. The records from these treating physicians and treating health care providers, however, don't substantiate any of that. Her vitals come back normal. They don't observe rashes. They don't observe tremors. They don't observe fevers. So their records indicate there's nothing here. The peer review physicians as well kind of give a second layer or a second set of eyes looking at all of these records. And in both situations, they said, there's nothing here that satisfies the definition of the plan. Dr. Weinstein, when she conducted her review on the initial denial of the claim, even had a peer-to-peer consultation with the treating physician, Dr. Wallace, who saw her on three different occasions. And Dr. Wallace said, I can't find anything that's causing all of these symptoms. He says, I've conducted thorough examinations. He said, I don't see anything that shows any record of any problem with her thyroid. And, in fact, subsequent documentation that Dr. Weinstein received said there's normal thyroid. With respect to the Lyme disease, even, Dr. Charles Arkin, a rheumatologist, saw her in October of 2012. Again, his physical examination was unremarkable. He says, I'm unable to diagnose any inflammatory arthritis. I question the diagnosis of clinical Lyme disease. And, in fact, I think to follow up on that, she really needs to see a specialist in infectious diseases. So even he, the treating physician, questioned this diagnosis. So in the end, I think there is ample evidence in the record that supports the plan's decision to say there is no condition here that satisfies the definition in the plan to qualify for short-term disability benefits. The district court, I think, made the proper decision here and should be upheld. So unless there are any further questions. What sort of specialties did Drs. Callahan and Chris have? Are they family doctors? Are they internal medicine or something? Your Honor, I'm actually looking at my notes, and I don't recall. I believe my best recollection is that Dr. Callahan was more of a family practitioner. Dr. Christ, I have no knowledge as to what his background was. We don't have anybody who would be treating a lot of Lyme disease people, I suppose. Or at least we don't know about it. I don't believe we know about it exactly, Your Honor. I don't believe it's in the record. Anything, if there's nothing further? There is not. Again, I would ask that the district court's opinion be affirmed. Thank you. In rebuttal, I would simply like to make two broad points. One with respect to the objective nature of the condition, and another with respect to the vocational consequences of the medication regime. With respect to the consequences of the medication regime, I would submit that there is absolutely no evidence of record to contradict Ms. Brown's statement that she was not allowed to bring that equipment and use that equipment at work. We do not see the plan consulting with a vocational expert to say, hey, would this be allowed generally? We don't see the plan consulting with the manager herself or the manager's boss or HR. We simply don't see any analysis, any investigation on that point at all. This court and other courts have agreed that a plan has a fiduciary obligation of investigation. A plan can't turn a blind eye to a potential basis for approving the claim once it's pointed out to them. And I would also point out that this is a question, this is evidence that is far more within the control of FedEx than it is within the control of my client. Is this something that could be brought under the ADA instead of in this fashion, if they fail to accommodate her? I believe that if an accommodation could reasonably have been had, potentially this would be an ADA question. That's what you claim, don't you? But FedEx was the one who said that this wasn't allowed on the face of this record. The other point that I did want to make briefly was that with respect to the question of objective findings, the doctors did not place her on, she is objectively on the medical regimen, and the doctors did not place her on the medical regimen on her say-so, on a subjective description of her symptoms, but actually on the basis of testing. Yes, Igenex and CDC have differing views on the proper diagnosis of Lyme disease, but the doctors did do this on the basis of testing. And this is for FedEx to disclaim the vocational consequences of the medication regime on the basis of thinking that it's medically unnecessary. That is essentially the same thing as saying, we're not going to consider the vocational consequences of your lumbar fusion because our orthopedist says that your orthopedist was too surgery happy and got there too quickly. Thank you. Thank you, counsel. Case will be submitted.